IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

    **Plaintiff,**

        **v.**                        **Criminal No.** 24—018 (FAB)

WILLIE TORRES-GERENA,

    **Defendant.**

## OPINION AND ORDER

BESOSA, District Judge.

Before the Court is defendant Willie Torres-Gerena ("Torres")'s motion to dismiss the indictment. (Docket No. 44.) Magistrate Judge Marshal Morgan issued a Report and Recommendation ("R&R") on February 12, 2025. United States v. Torres-Gerena, Case No. 24-018, 2025 WL 477200 (D.P.R. Feb. 12, 2025) (Morgan, Mag. J.); see Docket No. 67. The R&R recommends that the Court deny the motion to dismiss. Id. For the reasons set forth below, the Court **ADOPTS** the R&R. Accordingly, Torres' motion to dismiss is **DENIED**.

## I.   Background

A grand jury returned a one-count indictment on January 24, 2024, alleging that Torres knowingly transported a 16-year-old female minor, in a commonwealth, territory or possession of the United States, with intent that the minor engage in criminal sexual

activity, in violation of 18 U.S.C. § 2423(a) (transportation of a minor with intent to engage in criminal sexual activity) ("section 2423(a)").  (Docket No. 3.)  Torres is alleged to have taken the 16-year-old from the municipality of Arecibo to the municipality of San Juan under the pretense of taking her to dinner.  On their way back to Arecibo, Torres is alleged to have taken the minor to a motel in Arecibo where he committed lewd acts against her.  It is undisputed that all travel occurred within Puerto Rico.

Torres moved to dismiss the indictment on July 3, 2024, asserting that section 2423(a) "violates [Torres'] rights as a U.S. citizen under the Fourteenth Amendment as well as his Fifth Amendment right to due process through equal protection of the law." (Docket No. 44 at p. 2.)  Torres argues that section 2423(a) violates the Citizenship Clause of the Fourteenth Amendment and the privileges and immunities guaranteed to citizens of the United States therein because section 2423(a) discriminates against U.S. "citizen residents" in Puerto Rico.  (Docket No. 44 at pp. 3-4.) Additionally, Torres argues that section 2423(a) violates the Commerce Clause because Puerto Rico is no longer a territory, and any congressional action as to Puerto Rico needs to comply with the Commerce Clause, U.S. Const. art. I, § 8, cl. 3, as it would for the fifty states.  Id. at pp. 9-10.  Finally, Torres argues

that section 2423(a) violates the Due Process Clause of the Fifth
Amendment based on two theories.  First, that the unequal treatment
"citizen residents" in Puerto Rico as opposed to residents in the
fifty states creates a suspect classification and violates a
fundamental right which can only be allowed if it surpasses strict
scrutiny.  Id. at pp. 11-12.  Alternatively, Torres argues that,
even if rational basis review applied to this unequal treatment,
it still cannot pass constitutional muster.  Id. at p.13.

The government responded.  (Docket No. 49.)  Magistrate Judge
Morgan issued a R&R on February 12, 2025 recommending denying the
motion to dismiss.  (Docket No. 67.)  Torres filed objections.
(Docket No. 71.)

## II.  Legal Standard

An indictment is sufficient "if it contains the elements of
the offense charged, fairly informs the defendant of the charges
against which he must defend, and enables him to enter a plea
without fear of double jeopardy."  United States v. Ford, 839 F.3d
94, 104 (1st Cir. 2016) (internal quotation marks and citation
omitted).  "[I]t is generally sufficient that an indictment set
forth the offense in the words of the statute itself as long as
those words [contain] all the elements of the offense without any
uncertainty or ambiguity."  United States v. Brown, 295 F.3d 152,

154 (1st Cir. 2002) (internal quotation marks and citation omitted).

To adjudicate a motion to dismiss, courts "must take the allegations in the indictment as true," cognizant that "the question is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient to apprise the defendant of the charged offense." United States v. Ngige, 780 F.3d 497, 502 (1st Cir. 2015) (citation omitted). Notably, the indictment need not provide a preview of the evidence to be adduced at trial. See United States v. Stepanets, 879 F.3d 367, 372 (1st Cir. 2018) (noting that the "government need not recite all of its evidence in the indictment").

**A.   Report and Recommendation: Standard of Review**

A district court may refer a pending motion to a magistrate judge for a report and recommendation. See 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(a); Loc. Rule 72(b). A party may file written objections to the magistrate judge's R&R within 14 days of publication. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); Loc. Rule 72(d).

A party that files a timely objection is entitled to "a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."

28 U.S.C. § 636(b)(1). An issue not raised before the magistrate judge may be deemed waived by the district court. Borden v. Sec. of Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1987); see also Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 990-91 (1st Cir. 1988) ("[A]n unsuccessful party is not entitled as of right to *de novo* review by the judge of an argument never seasonably raised before the magistrate.").

In conducting its review, the district court is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. §636(b)(1); see Loc. R. 72(d); Álamo-Rodríguez v. Pfizer Pharms., Inc., 286 F. Supp. 2d 144, 146 (D.P.R. 2003) (Domínguez, J.). "The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1). Furthermore, the Court may accept those parts of the report and recommendation to which the parties do not object. See Templeman v. Chris Craft Corp., 770 F.2d 245, 247-48 (1st Cir. 1985); Hernández-Mejías v. Gen. Elec., 428 F. Supp. 2d 4, 6 (D.P.R. 2005) (Fusté, J.).

### B.  Statutory Framework

Section 2423(a) provides that whoever knowingly transports an individual who has not attained the age of 18 years in interstate or foreign commerce, or in any commonwealth, territory or possession of the United States,

> with intent that the individual engage in
> prostitution, or in any sexual activity for
> which any person may be charged with a
> criminal offense, shall be fined . . . and
> imprisoned not less than 10 years or for life.

18 U.S.C. § 2423(a).  The section was originally enacted in 1910

as part of the Mann Act, which is also known as the "White Slave

Traffic Act," 36 Stat. 825, Ch. 395 (1910) (codified as amended at

18 U.S.C. §§ 2421-2428). In 1998, section 2423(a) was amended to

include the term "commonwealth" so that it reads as stated above.

In United States v. Cotto-Flores, 970 F.3d 17 (1st Cir.

2020), the First Circuit Court of Appeals ("First Circuit")

considered the constitutionality of section 2423(a)'s application

for conduct occurring wholly within Puerto Rico, stating that

> [u]nder the U.S. Constitution, Puerto Rico is
> still a 'territory,' meaning that Congress
> (acting under its power to 'make all needful
> Rules and Regulations respecting the Territory
> . . . belonging to the United States,' U.S.
> Const., Art. IV, § 3, cl. 2), 'may treat Puerto
> Rico differently from the States so long as
> there is a rational basis for its actions.'

Id. at 30 (citing United States v. Vaello-Madero, 956 F.3d 12, 20

(1st Cir. 2020)).  As such, Congress could regulate conduct

occurring purely within Puerto Rico and the addition of

"commonwealth" in the statute clearly reflected Congress' intent

to regulate conduct within the island territory.  Id. at 32-34.

## III. Discussion

Torres objects to the magistrate judge's recommendation for three reasons.  First, because Puerto Rico is a state-like "commonwealth," rather than a territory, the Commerce Clause precludes the regulation of conduct that is not regulable in the fifty states.  (Docket No. 71 at p. 5.)  Second, Torres reiterates that the Fifth Amendment prevents enforcement of section 2423(a) intra-Puerto Rico because the statute discriminates against Puerto Ricans and cannot survive strict scrutiny or, alternatively, does not have a rational basis.  Id. at pp. 5-8.  Third, he argues that the R&R does not engage with the argument that section 2423(a)'s application within Puerto Rico violates both the Citizenship Clause, and the Privileges and Immunities Clause of the Fourteenth Amendment.  Id. at p. 2-3.  Before addressing Torres' objections to the R&R, the Court will discuss the origins and scope of the Federal Government's power to legislate and enforce laws in Puerto Rico.

### A.    Puerto Rico's Relationship with the United States

In 1898, Spain and the United States signed the Treaty of Paris, ending the Spanish American War.  The treaty ceded Puerto Rico to the United States.  See Treaty of Peace between the United States of America and the Kingdom of Spain, December 10, 1898, 30 Stat. 1754, 1755 (proclaimed on Apr. 11, 1899) ("Article II. Spain

cedes to the United States the island of Porto Rico . . . .").
Among other things, the treaty stated that: "The civil rights and
political status of the native inhabitants of the territories
hereby ceded to the United States shall be determined by the
Congress." Id.

During the first two years following the treaty, Puerto
Rico was under a military government. In 1900, Congress
established a civil government by enacting the Foraker Act. 31
Stat. 77-86, P.R. Laws Ann. Tit. 1, Historical Documents. All
laws promulgated had to be reported to Congress, however, which
reserved the power and authority to annul them. Id. at § 31. The
Foraker Act also created the office of the Resident Commissioner,
Puerto Rico's non-voting member of Congress. Id. at § 39.

In 1917, Congress enacted the Jones Act, creating a
popularly elected bicameral legislature, and a bill of rights for
the people of Puerto Rico while also granting them United States
citizenship. 39 Stat. 951, P.R. Law Ann. Tit.1, Historical
Documents. Then, in 1947, Congress allowed residents of Puerto
Rico, for the first time, to elect their own governor through the
Elective Governor Act. Pub. L. No. 80-362, 61 Stat. 770. The Act
gave the Governor of Puerto Rico the power to appoint all executive
positions, subject only to the consent of the Puerto Rico senate.
Id. The President of the United States, however, continued to

appoint the Auditor and the Justices of the Supreme Court of Puerto Rico.  Additionally, the President was authorized to exempt Puerto Rico by Executive Order from any federal statute not expressly applied to Puerto Rico by Congress.  Id. at § 6.  Finally, the Act stated "[t]he rights, privileges, and immunities of citizens of the United States shall be respected in Puerto Rico to the same extent as though Puerto Rico were a State of the Union and subject to the provisions of paragraph 1 of section 2 of article IV of the Constitution of the United States."  Id. at § 7.[1]

In 1950, amid the global fervor of postwar decolonization, Congress enacted Public Law 600 and authorized the people of Puerto Rico to organize a government pursuant to a constitution of their own adoption.  Pub. L. No. 81-600, 64 Stat. 319.  Once a constitution was drafted and accepted by the voters in Puerto Rico, it had to be approved by the President and then approved by Congress before it became effective.  In 1952, a constitution was approved, and Congress adopted the proposed constitution except for two sections that it eliminated and two amendments it imposed.  Pub. L. No. 82-447, 66 Stat. 327 (1952). These amendments were then accepted by the Constitutional Convention in Puerto Rico.  Upon Congressional ratification of the

---

[1] This section is now codified under the Puerto Rico Federal Relations Act, 48 U.S.C. § 737.

new Puerto Rico constitution, the provisions of the Jones Act

dealing with the internal government were repealed and replaced,

thus creating what came to be known in English as the "Commonwealth

of Puerto Rico."[2]  The unrepealed provisions of the Jones Act were

---

[2] Contrary to what then Judge Breyer stated in Córdova & Simonpietri Ins. Agency Inc. v. Chase Manhattan Bank N.A., 649 F.2d 36, 41 (1st Cir. 1981), "Commonwealth" is not a unique status, but a label given to a body politic.  Cf. United States v. Maldonado-Burgos, 844 F.3d 339, 341 (1st Cir. 2016) ("[T]he Puerto Rico Constitution 'created a new political entity, the Commonwealth of Puerto Rico.")  This can be seen in the fact that four states (Kentucky, Massachusetts, Pennsylvania, and Virginia) also refer to themselves as Commonwealths without being treated differently from any other State of the Union.

"The body created by the constitution was [in fact] named the Estado Libre Asociado de Puerto Rico, which should have been translated 'the Free Associated State of Puerto Rico,' but was instead dubbed, by convoluted and misleading interpretation of the Spanish terms, the Commonwealth of Puerto Rico." JOSÉ TRÍAS MONGE, THE TRIALS OF THE OLDEST COLONY IN THE WORLD 114 (Yale University Press 1997).  The English phrasing of "the Free Associated State of Puerto Rico" may have sat in awkward tension with Puerto Rico's actual constitutional status – as a U.S. territory and not an independent country, Puerto Rico is not free; as an "unincorporated" territory, it is not "associated;" and it is not a state in the sense of being a "State of the Union."  Indeed, as an "unincorporated territory," Puerto Rico belongs to, but is not considered a part of, the United States.

The Court recognizes that this analysis may question Maldonado-Burgos' holding.  There, the First Circuit Court of Appeals determined that section 2421(a) – another provision of the Mann Act - did not apply to conduct occurring wholly within Puerto Rico because when its status "changed from territory to commonwealth, Congress intended to treat Puerto Rico like a State for purposes of section 2421(a).  Maldonado-Burgos, 844 F.3d at 350.  The case, which was decided in December 2016, ignores Congress' enactment of PROMESA in June 2016 and its effect on the general understanding in the First Circuit that Congress intended to treat Puerto Rico like a State post-1952.  If this Court, however, follows Cotto-Flores' reasoning that the inclusion of the term "commonwealth" meant Congress intended to cover conduct occurring within Puerto Rico, then Congress' omission of the term "commonwealth" may show their intent not to apply section 2421(a) to Puerto Rico.  See Cotto-Flores, 970 F.3d at 32-33.  But this is a question for another case.

Criminal No. 24—018 (FAB)                                        11

re-titled to the Puerto Rican Federal Relations Act, 48 U.S.C.

§ 731 *et seq*. ("PRFRA").

        The First Circuit Court of Appeals has stated that the

creation of the Commonwealth "marked a significant change in the

relation between Puerto Rico and the United States." United States

v. Cotto-Flores, 970 F.3d 17, 28 (1st Cir. 2020) (citing Córdova

& Simonpietri Ins. Agency Inc. v. Chase Manhattan Bank N.A., 649

F.2d 36, 42 (1st Cir. 1981)).  Whether this significant change was

Congress' intent is debatable.  For instance, when Antonio Fernós-

Isern, the then Resident Commissioner, testified before the Senate

subcommittee considering S. 3336, the precursor of Public Law 600,

he stated: "[a]s already pointed out, S. 3336 would not change the

status of the island of Puerto Rico relative to the United States

. . . It would not alter the powers of sovereignty acquired by the

United States over Puerto Rico under the Treaty of Paris." Puerto

Rico Constitution: Hearing on S. 3336 Before S. Comm.  Of the S.

Comm. On Interior and Insular Affs., 81st Cong. 4 (1950) (Statement

of Hon. Antonio Fernós-Isern, Resident Commissioner of Puerto

Rico).  Additionally, a Report of the Department of the Interior

to the Senate Committee stated that "[S. 3336] would not change

Puerto Rico's fundamental political, social and economic

relationship to the United States." Id. at p. 37.  Gov. Luis Muñoz

Marín, the first democratically elected Governor of Puerto Rico,

Criminal No. 24—018 (FAB)                                                    12

expressed a similar understanding at a House Committee hearing in

response to Congressman William Lemke's hypothetical question

about Puerto Rico's power to unilaterally amend its constitution:

> You know, of course, that if the people of
> Puerto Rico should go crazy, Congress can
> always get around and legislate again. But I
> am confident that the Puerto Ricans will not
> do that and invite congressional legislation
> that would take back something that was given
> to the people of Puerto Rico as good citizens.

Hearing on H.R. 7674 Before the H. Comm. on Public Lands, 81st

Cong. 17-18 (1950) (Statement of Luis Muñoz Marín, Governor of

Puerto Rico).[3]

Despite this legislative history, in 1953, Puerto Rico

and the executive branch of the United States were able to convince

---

[3] For more discussion on this topic, see LCDO. VICENTE GÉIGEL POLANCO, LA
FARSA DEL ESTADO LIBRE ASOCIADO (Editorial Edil., 3rd ed. 2010); TRÍAS MONGE,
supra note 2, at 107-40; JUAN R. TORRUELLA, THE SUPREME COURT AND PUERTO RICO:
THE DOCTRINE OF SEPARATE AND UNEQUAL 144-60 (1985); David M. Helfeld, *The
Historical Prelude to the Constitution of the Commonwealth of Puerto
Rico*, 21 Rev. Jur. U.P.R. 135 (1952).

Criminal No. 24—018 (FAB)                                    13

the United Nations that a "compact"[4] existed between the United
States and Puerto Rico through which Puerto Rico had attained a
full measure of self-government.  The reality of this "monumental
hoax"[5] became fully evident in 2016 when Congress enacted, without
consulting the People of Puerto Rico, the Puerto Rico Oversight,
Management and Economic Stability Act, 48 U.S.C. §§2101-2241
("PROMESA") pursuant to its territorial powers under article IV,

_____

[4] The "compact" idea traces its origins back to the language used in the
Northwest Ordinance of 1787, which stated that its provisions were
adopted "as articles of a compact between the original States, and the
people and States in the said territory, and forever remain unalterable,
unless by common consent." TRÍAS MONGE, supra note 2, at 111 (citing 1
Stat. 50, at L. 51, f(a)).  Fernós-Isern was concerned, however, that
use of the word "compact" between Puerto Rico and the United States in
the same manner as in the Northwest Ordinance would jeopardize the
passage of Public Law 600.  See id.  For that reason, Public Law 600
simply states that it was "adopted in the nature of a compact." 64 Stat.
319 (1950) (emphasis added); see also, 66 Stat. 327 (1952) (Joint
Resolution approving the constitution of Puerto Rico, which was "adopted
in the nature of a compact.").  The fact that Public Law 600 and the
constitution of Puerto Rico were passed "in the nature of a compact" did
not create a compact between Puerto Rico and the United States requiring
Puerto Rico's consent for any change, as evidenced by the passing of the
Puerto Rico Oversight, Management and Economic Stability Act (PROMESA)
without consulting the people of Puerto Rico (see infra.)

[5] Words of Chief Judge Magruder in Figueroa v. The People of the Puerto
Rico, 232 F.2d 615 (1st Cir. 1956) stating that it would be a "monumental
hoax" to argue that the constitution of Puerto Rico is "just another
Organic Act of Congress."  Id. at 620.  The Court uses Chief Judge
Magruder's phrase to emphasize that to argue that a "compact" exists
between the United States and Puerto Rico is a "monumental hoax."

section 3 of the Constitution of the United States.[6]  PROMESA, §

2121(b).

      What "Congress giveth, Congress taketh away." <u>Centro de</u>

<u>Periodismo Investigativo v. Fin. Oversight & Mgmt. Bd. for Puerto</u>

<u>Rico</u>, Civil No. 17-1743, 2018 WL 2094375, *1 (D.P.R. May 4, 2018)

(García-Gregory, J.).  Although the government of Puerto Rico

"dubbed" as a "Commonwealth" continues to this day, "[PROMESA]

establishes a . . . regime that in many ways replicates the first

attempt at colonial governance under the Foraker Act."  Juan R.

Torruella, *Why Puerto Rico Does Not Need Further Experimentation*

*with its Future: A Reply to the Notion of "Territorial Federalism"*,

131 Harv. L. Rev. F. 65, 89 (2018).  PROMESA, which applies to any

territory,[7] established an unelected Oversight Board that has broad

powers over Puerto Rico's elected representatives.  The Oversight

Board is considered an entity within the "territorial government,"

---

[6] The First Circuit Court of Appeals has even acknowledged that their previous rulings "exaggerate the rights the 1950-52 Acts granted Puerto Rico and its people." <u>Cotto-Flores</u>, 870 F.3d at 30.  This calls into question whether the holdings in <u>Córdova</u> and <u>Maldonado-Burgos</u> are suspect.

[7] PROMESA defines the term "territory" to include, along with Puerto Rico, the territories of Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and the United States Virgin Islands.  48 U.S.C § 2104(20).  To date, Congress has only established an Oversight Board for Puerto Rico, but can establish one for any territory pursuant to PROMESA.  <u>See</u> 48 U.S.C. §2121(a) ("The purpose of the Oversight Board is to provide a method for a covered territory to achieve fiscal responsibility and access to the capital markets.").

Criminal No. 24—018 (FAB)                                    15

but "neither the Governor nor the Legislature exercises any
control, supervision, oversight or review over [it] or its
activities." PROMESA, §§ 2121(c)(1); 2128(a). The Governor and
Legislature also cannot "enact, implement, or enforce any statute,
resolution, policy or rule that would impair or defeat the purposes
of [PROMESA], as determined by the Oversight Board." PROMESA,
§ 2128(a).

     The Commonwealth's composition as modified by Congress
in PROMESA does not support a conclusion that Puerto Rico's status
is the functional equivalent of a State. Rather, it leads to the
inevitable conclusion that "the tectonic plates [did not shift] in
1950" and Puerto Rico's status as a territory of the United States
never changed. Cotto-Flores, 970 F.3d at 29; see id. at 30 ("Under
the U.S. Constitution, Puerto Rico is still a 'Territory,' meaning
that Congress (acting under its power to 'make all needful Rules
and Regulations respecting the Territory . . . belonging to the
United States,'. . . may treat Puerto Rico differently from the
States so long as there is a rational basis for its actions.");
see also United States v. Montalvo-Febus, 254 F.Supp.3d 319, 328
(D.P.R. June 5, 2017) (Delgado-Hernández, J.).

     **B.  Commerce Clause**

     Torres first argues that Congress needs to comply with
the Commerce Clause when regulating behavior in the states,

including Puerto Rico.  His argument is based on the premise that
once Puerto Rico became a "Commonwealth" in 1952, it was a state-
like entity and ceased being a territory.  Such contention can no
longer be true.  An unelected Oversight Board could not be imposed
by Congress for, and would and not be tolerated in, any State of
the Union.  Because Puerto Rico remains a territory, Congress'
power to regulate conduct in Puerto Rico does not derive from the
Commerce Clause but from the Territorial Clause.  See id.
("Congress . . . may treat Puerto Rico differently from the States
so long as there is a rational basis for its actions."); Harris v.
Rosario, 446 U.S. 651 (1980) (per curiam) (same).

        Torres cites to Sea-Land Servs., Inc. v. Mun. of San
Juan, 505 F. Supp. 533, 546 (D.P.R. 1980) (Pesquera, C.J.) to
support his argument that the Commerce Clause applies to Puerto
Rico.  Torres is correct in stating that Sea-Land Servs., Inc.
held that the Commerce Clause applies to Puerto Rico.  The
implication of the case, however, is not that Congress' regulatory
power in Puerto Rico is limited by the Commerce Clause in the same
manner as if Puerto Rico were a State, but that the government of
"Puerto Rico is constrained by the prohibitory implications of the
Commerce Clause as construed by the Supreme Court of the United
States."  Sea-Land Servs., Inc., 505 F.Supp. at 546.  "This,
however, does not mean that the Commerce Clause applies to Puerto

Rico *ex propio vigore*, but that its prohibitive effect is binding on the Commonwealth through the Territorial Clause . . . ."  Id.

Therefore, Torres' Commerce Clause argument is misplaced and does not provide a valid reason for dismissing his indictment.

**C.    Due Process Clause of the Fifth Amendment**

Torres next objects to the R&R's determination that the differential treatment under section 2423(a) of citizen-residents of Puerto Rico is permitted under the equal protection guarantee in the Due Process Clause of the Fifth Amendment.  Torres first takes issue that the magistrate judge did not use heightened scrutiny in evaluating the constitutionality of section 2423(a) because its intra-territorial application singles out citizens in Puerto Rico, a majority Hispanic population, and because it impacts a fundamental right (freedom from discriminatory punishment). (Docket No. 71 at pp. 6-8.)  Additionally, Torres argues that, even if rational basis applied, section 2423(a) does not pass rational basis review.  Id.

This Court does not find an error in the magistrate judge's recommendation.  The Fifth Amendment's Due Process Clause assures that the same equal protection principles of the Fourteenth Amendment generally constrain the federal government, even though there is no explicit equal protection clause in the Fifth Amendment.  Bolling v. Sharpe, 347 U.S. 497, 500 (1954).  A law

that classifies people "based on national origin, ancestry, and race must withstand the strictest constitutional scrutiny." DiMarco-Zappa v. Cabanillas, 238 F.3d 25, 36 (1st Cir. 2001). If instead a law creates a classification not based on suspect or quasi-suspect class, and the classification does not implicate a fundamental right, the law survives an equal protection challenge if the distinction is "rationally related to a legitimate government interest." United States v. Montijo-Maysonet, 974 F.3d 34, 44 (1st Cir. 2020).

"[I]t's crystal clear a law targeting people of Puerto Rican origin would draw the strictest scrutiny," id., but, as stated in the R&R, "the statute, by its plain language, applies universally to all individuals – residents of Puerto Rico or otherwise – who transport a minor for the purpose of engaging in criminal sexual activity on the island." (Docket No. 67.) Section 2423(a) applies to tourists, transplants, and travelers. See Montijo-Maysonet, 974 F.3d at 45. Therefore, the statute does not single out Puerto Ricans by race or national origin, and rational basis applies.

Furthermore, contrary to what Torres argues, a violation of a fundamental right does not trigger a heightened scrutiny in Puerto Rico. For instance, the Supreme Court applied rational basis to find that the exclusion of Puerto Rico was constitutional when

it was argued that a law violated a person's fundamental right to
travel[8] by simply moving to Puerto Rico. <u>Califano v. Gautier</u>, 435
U.S. 1 (1978) (*per curiam*).  The Court sees no reason to apply a
different type of scrutiny between fundamental rights.
Furthermore, the Supreme Court has recently reiterated that
"Congress could treat Puerto Rico differently from States so long
as there was a rational basis for its actions." <u>United States v.</u>
<u>Vaello-Madero</u>, 596 U.S. 159, 164-65 (2022).  Accordingly, this
Court is constrained to follow precedent and will apply rational
basis.

       A law survives rational basis if there exists any
plausible set of facts that could rationally support the
classification. <u>See F.C.C. v. Beach Communications, Inc.</u>, 508
U.S. 307, 313 (1993).  Under rational basis, there is a strong
presumption of the law's validity, and those challenging it carry
the burden of disproving "every conceivable basis" that could
justify it. <u>Id.</u> at 314-15.  If there is a plausible reason, our
inquiry is at an end. <u>United States v. R.R Ret. Bd. v. Fritz</u>, 449
U.S. 166, 179 (1980).  Congress need not state the reasons for
enacting the statute; a court may rationally speculate the basis

---

[8] Other recognized fundamental rights are freedom of speech and
association, free exercise of religion, substantive and procedural due
process, and equal protection.

Criminal No. 24—018 (FAB)                                    20

of the classification with specific evidence or data.  Beach
Communications, Inc., 508 U.S. at 314.

       The Court agrees with the R&R that there is a rational
basis for the enactment of section 2423(a) because "Congress has
a  legitimate  interest  in  eliminating  sexual  exploitation,
particularly of minors, from U.S. territories." (Docket No. 71 at
7.)  Additionally, the legislative history of the 1998 amendment
reveals that Congress intended to adopt a stringent approach to
combat the sexual exploitation of children.  By enacting section
2423(a) to apply intra-territorially to Puerto Rico, Congress is
using its explicit powers to make rules and regulations respecting
the territories. See U.S. CONST. art. IV, § 3.  And as evidenced
above, "there is no indication that at any point Congress has
deprived itself of that power in legislating for Puerto Rico."
See United States v. Lebrón-Cáceres, 157 F.Supp.3d 80, 96 (D.P.R.
Jan. 14, 2016) (Delgado-Hernández, J.).

       Therefore, section 2423(a) is a valid exercise of
Congress' power and related to a legitimate government interest.

       **D.  Fourteenth Amendment**

       Finally, Torres alleges that the application of section
2423(a) violates the Citizenship Clause of the Fourteenth
Amendment.  (Docket No. 71 at p. 2-3.)  Torres argues that the
granting of U.S. citizenship to Puerto Ricans also granted them

the privileges and immunities within it.  (Docket Nos. 44 at

pp. 3-5, 7-9; 71 at pp. 2-4.)  Among these, Torres states, is the

right to be free from discriminatory punishment because

citizenship gave Puerto Ricans equality before the law.  (Docket

No. 71 at p. 2, citing United States v. Vaello-Madero, 596 U.S.

159, 166-80 (2022) (Thomas, J., concurring).)

> Section 1 of the Fourteenth Amendment states:
>
> All persons born or naturalized in the United
> States, and subject to the jurisdiction
> thereof, are citizens of the United States and
> of the State wherein they reside. No State
> shall make or enforce any law which shall
> abridge the privileges or immunities of
> citizens of the United States; nor shall any
> State deprive any person of life, liberty, or
> property, without due process of law; nor deny
> to any person within its jurisdiction the
> equal protection of the laws.

> First, it should be noted that Torres does not assert

that Puerto Ricans obtained birthright citizenship through the

Citizenship Clause.[9]  See Docket No. 44 at p. 8.  Instead, Torres

asserts that he is guaranteed the fundamental rights codified in

---

[9] As discussed above, Puerto Rico is an unincorporated territory. As such, "Congress plays the preeminent role in the determination of citizenship in unincorporated territorial lands." Fitisemanu v. United States, 1 F.4th 862, 864 (10th Cir. 2021).  Congress conferred United States citizenship to all those born in Puerto Rico pursuant to the Jones Act of 1917, 39 Stat. 953, § 5(1917), and subsequent legislation granted birthright citizenship, see 8 U.S.C. § 1402.

the Citizenship Clause of the Fourteenth Amendment.[10]  Id.  He asks

this Court to apply the Citizenship Clause to the extent it

guarantees fundamental rights, one of which is equality under the

law for all citizens.  In support of this argument, he cites

Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero,

426 U.S. 572 (1976), where he alleges the Supreme Court extended

rights flowing from the Due Process and Equal Protection Clause of

the Fourteenth Amendment to Puerto Rico.  (Docket No. 44 pp. 7-8.)

Torres states "it would . . . make little sense for the Supreme

---

[10] Contrary to the Covenant with the Northern Mariana Islands, Congress did not extend the Citizenship Clause in its so called "compact" with Puerto Rico.  In the Covenant with the Northern Mariana Islands, section 501(a) states that section 1 of the Fourteenth Amendment applies to the Northern Mariana Islands.  See Sabangan v. Powell, 375 F.3d 818, 819 (9th Cir. 2004).

    In contrast, Congress only extended to Puerto Rico the first paragraph of section 2 of article IV of the Constitution pursuant to the PRFRA. See 48 U.S.C. § 737. Section 737 states "**[t]he rights, privileges, and immunities of citizens of the United States shall be respected in Puerto Rico to the same extent as though Puerto Rico were a State of the Union** and subject to the provisions of paragraph 1 of section 2 of article IV of the Constitution of the United States." Id. (emphasis added).  Torres might have a better argument under this statute than the Citizenship Clause.  This Court, however, will not address it because Torres did not raise it in his motion.  See United States v. Zannino, 895 F.2nd 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

    Yet, the Privileges and Immunities Clause under article IV are distinct from the one stated in the Fourteenth Amendment.  The prevailing view is that the clause under article IV "prevents a state from discriminating against citizens of other states in favor of its own." Hague v. Comm. for Indus. Org., 307 U.S. 385, 511 (1939).

Court to hold [these rights] apply to Puerto Rico whereas rights emanating from the Citizenship Clause do not."[11]  Id.

       While it is clear that residents of Puerto Rico do have an equal protection guarantee, the Supreme Court and the First Circuit "thus far ha[ve] declined to say whether it is the Fifth Amendment or the Fourteenth which provides the protection." Flores de Otero, 426 U.S. at 601, 601 n.32; see also DiMarco-Zappa, 238 F.3d at 36.  Therefore, this Court does not read Flores de Otero to unequivocally apply the Fourteenth Amendment to Puerto Rico.[12]

       In any case, whether the Federal Government violates any protection or right under the Citizenship Clause of the Fourteenth Amendment when it creates a classification among citizens has not

---

[11] Torres alleges in his objections to the R&R that "if the Due Process and Equal Protection clauses of the Fourteenth Amendment apply in Puerto Rico, there is no reason to believe that the rights conferred by the Privileges and Immunities Clause does not." (Docket No. 71 at p. 3) (emphasis added).  Torres may have become confused as to which clause he was arguing for in his motion to dismiss.  To the extent this case pertains to actions made by Congress, the Privileges and Immunities clause of the Fourteenth Amendment does not apply because it applies solely to state action.  See Vaello-Madero, 596 U.S. at 177.

[12] Whether the Fourteenth Amendment applies to Puerto Rico ex propio vigore does not concern us here. But it is worth noting that Congress also did not explicitly extend the Fourteenth Amendment to Puerto Rico as was done in the Organic Acts for the Virgin Islands and Guam.  See Revised Organic Act of the Virgin Islands of 1954, 48 U.S.C. § 1561)("The following provisions of and amendments to the Constitution of the United States are hereby extended . . . to the extent that they have not been previously extended to that territory and shall have the same force and effect there as in the United States or in any State of the United States: . . . the second sentence of section 1 of the Fourteenth Amendment . . . ."); see also Organic Act of Guam, 48 U.S.C. §1421b(u), Pub. L. 81-630, 64 Stat. 384 (1950) (same).

Criminal No. 24—018 (FAB)                                        24

been determined by any court.  The only discussion about the existence of a possible equal protection guarantee claim under the Citizenship Clause has been Justice Thomas' concurrence in <u>Vaello-Madero</u>, 596 U.S. at 177-78.  There, Justice Thomas argues that it might be more supportable to find an equal protection guarantee enforceable against the Federal Government in the Citizenship Clause rather than the Fifth Amendment's Due Process Clause.  <u>Id.</u> Justice Thomas, however, bases his reasoning on his historical interpretation of each clause and implies that the equal protection right itself would be similar in either case.  <u>Id.</u> at 179-80. Therefore, even if there are rights under the Citizenship Clause which prohibit the Federal Government from denying equal protection under the law, this Court sees no reason to apply a different test than that which already exists under the Fifth Amendment's Due Process Clause.

        Accordingly, the Court finds no merit in Torres' objections and **ADOPTS** the R&R.  Torres' motion to dismiss at Docket No. 44 is **DENIED**.

**IV.  Conclusion**

    For the reasons set forth above, the Court **ADOPTS** the magistrate judge's February 12, 2025 Report and Recommendation. (Docket No. 67.)  Consequently, Torres' motion to dismiss the indictment is **DENIED**.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, May 8, 2025.

<u>s/ Francisco A. Besosa</u>
FRANCISCO A. BESOSA
SENIOR UNITED STATES DISTRICT JUDGE